May it please the court, my name is Paul Turk. I represent the appellant in this case, Fence Creek Cattle Company. This case is about a livestock grazing permit cancellation decision issued by the US Forest Service. The standard of review is the Administrative Procedure Act. I was able to listen to the last case enough to ascertain that a jury verdict was rendered in that case. This case is on the diametrically opposite side of the procedural spectrum. This is de novo review in this case. Well, it's de novo review under an arbitrary and capricious standard with deference to the agency's decision-making process, is it not, in terms of factual findings to the extent there are any that support the decision? Certainly. And I was about to say there's two elements to our argument. Number one, there are mandatory procedures that were either ignored or not followed properly. And number two, with regard to factual conclusions, they were either necessary but absent, or they're flatly contradicted by the record. Well, your basic position is that you were denied due process, right? And due process normally requires notice and an opportunity to be heard. The record suggests multiple communications in the form of telephone calls, meetings, letters, back and forth. I'm really kind of out of it. I'm in a two-level internal administrative review process within the Forest Service clear up to the regional forester. I'm having a hard time understanding why you didn't have fair warning and an opportunity to explain why the cattle were wandering off into allotments that they weren't supposed to be grazing in. Because too much process too late doesn't satisfy the statute. To quote the Blackwell Business College Court, I will concede that we had abundant opportunity to talk to the Forest Service and to try to convince them. But it was to convince them of a position, quote, already crystallized. In other words, the die had already been cast. Our legal house had been put in. Is that true? I mean, the first thing they do is basically contact your client and say, look, our forest rangers are finding your cattle in places they're not supposed to be. And we're not sure you even own some of these cattle. Can you explain what's going on here? So what's wrong with that? I need to correct that characterization. Because a typical grazing permit cancellation case is that scenario. Is my cattle being on the wrong side of the fence? This is the allegation that somebody else's cattle were running with ours. Yeah. There's cattle there, but they're not the permittees. And again, to get back to the APA statutory language, it's written notice before the institution of agency proceedings. And that is not what happened here. How does the agency ever commence an investigation without at least a telephone call or a meeting? I mean, they did that, didn't they? They had informal. What the record appears to reflect is they had informal contact. And then with the permittee, then there was calls. There was an investigation underway. There were calls to state brand inspectors, realtors for the parties. And then when the written notice first issued, it was along the lines of a show cause letter. We've looked in the file, and what you've given us isn't good enough. Produce more. So why is that not first notice of a concern that you haven't shown ownership of the cattle and an invitation to try and explain what has not yet been adequately explained as to who owns the cow? Well, I mean, it's these are all the questions that would have been asked in Anschustigee. And as I read the Anschustigee decision, the key is who asked what when. I mean, our case, and I'm a little bit familiar with the case that's going to follow here, our case focuses on what does the before institution of agency proceedings mean. And our contention is that the agency's case was far too well constructed. And again, back to Blackwell Business College, was essentially crystallized to the point which we couldn't get it off of its center. I got that. I gleaned from your briefing that you're taking kind of a very technical view of the phrase institution of agency proceedings. And I'm not sure, frankly, besides a letter, what evidence there might be of such an action by the agency. What would you have had the agency do in lieu of all these informal contacts first before the letters started flying? Send the letter first. You know, it has to be a letter? The ranger can't pick up the telephone and say, I see cows there with the wrong brand on that allotment. Well, OK. Who owns that cow? I think that's, I mean, if I were advising the agency, I'd have them send a letter first. I've got some questions about your permitted livestock. But then you'd be arguing that the agency had instituted proceedings by sending the letter without giving your client an opportunity. No, because if the letter comes first, this argument would be an even deader end for me than you're implying. Well, I haven't made up my mind yet, but I'm trying to understand what your legal argument is. And I'm having a difficult time applying a due process framework trying to figure out why you didn't have fair warning from the Forest Service before they dropped the hammer on your client and canceled the grazing permit. Let me be following up on what Judge Solomon said. A little more specific, according to my notes from records of record 266, 267, the Forest Service contacted Bruce, is it, did you say Agar? Agar, that's correct. About the grazing permit in June 2005. Rick Smith's notes of a June 13, 2005, call indicate that Bruce Agar was asked to provide information about Fence Creek and the purchase of the permitted cattle. That's at excerpts of record 268. Then Rick Smith spoke with Bruce Agar again on June 20, 2005, told him that action could be taken against the grazing permit if Fence Creek was violating the grazing permit terms. That's excerpts of record 278. Is there anything that you're aware of in that time period that indicates that the Forest Service had already begun proceedings to cancel the permit? Well, I think, I mean, our contention is that the institution of proceedings was reflected in the June 28 letter. And our argument, and again, consistent with my answer to Judge Tallman, what I believe the APA says is that the letter comes first, and then the investigation can follow. But doesn't that, Judge Tallman was trying to get you to focus on the reality, common sense aspect. Everybody's a rancher, you know? We want to deal with each other. You pick up the phone, you call or whatever. You don't have to send a bunch of letters initially. You just talk to the guy. And that's apparently what happened. You don't have a situation here where the first thing he gets is a letter indicating that cancellation permits are underway, like Anshu Tegwig. That's the, this case is so complex, factually more so than legally. I understand what you're saying, just calling up your friend down the road. This was literally days after the settlement agreement was signed between the various individuals involved. And that's why I keep coming back to Blackwell Business College, which has the language, put its house in lawful order. A house could not be in worse lawful order than this house was at this time. I want to, if you'll forgive me, I need to pull away from this issue because this is not our primary grounds for reversal on appeal. Our primary grounds for reversal, and to loosely analogize to the preceding case, is that there was an essential element of the prima facie case here that was literally not even addressed, not by the Forest Service, barely by the magistrate, and then with some vigor by the district court. And the district's- But with all respect, counsel, I mean, this case is replete with what appear to be shenanigans. You know, there's a representation, you have a certain head of cattle here, it's not yours, nobody knows who it belongs to, you provide documents that are not clear. When you look at the documents in detail, it turns out they were known by somebody else. I mean, this has got a lot of the, if I may, indicia of, if not fraud, certainly some pretty loose dealings with the facts. Why isn't the Forest Service fully justified in proceeding in the way that it did? I've got to turn you around on that. I mean, that's apparent to me. Give it a shot. Let's get to this wrong cattle thing, that we were grazing cattle that weren't owned by Fence Creek. First of all, that was not raised in June of 05. It was raised the year before, in 04. Well, isn't that the reason, counsel, isn't that the reason I'm looking at the June 28th letter? The first line of the letter talks about a telephone call from Rick Smith of the Forest Service on June 13, 2005 concerning ownership requests. No, Your Honor. Your Honor, isn't that what prompted the initial call? AR 626, excerpts of record 280. What is it? Is it a letter? Excuse me, that's the wrong one. 603, excerpts 266, midway down, first full paragraph. All right, I'm there. Those are notes. I talked, and this is the June. Notes from the Forest Service. Right, from the Forest Service employee on June 10. Smith? Smith. OK. I talked with Wayne Smith regarding ownership of cows observed during 04. If you look down a little bit, and these are admittedly hard to read. Yeah, I read it. Go ahead. Wayne said the same thing he told me on 8504, that the cattle had branded with the Lucky Diamond brand, et cetera, et cetera. We know that story. Well, the problem there was that they were using hair brands, not flesh brand, right? And it was hard for the Forest Service to tell whose brands were on the cattle. I've got another step here. 262. But I still don't understand the point of your citation. How does that contradict the statement that Mr. ---- the Forest Service made in the June 28th letter that what prompted the call on June 13 was because questions over ownership of the cattle? These notes are ---- The Forest Service, they basically came back in 05, and they restated the same questions that had been raised a year before. For whatever reason in 05, they decided to push through. I've got to get this cite to you. 594, 595 AR, 262, 263. These are the brand inspection certificates. These show three brands on the cows, the Lucky Diamond, the Smith brand, and the Sidaway brand. The brand inspection certificate is what the Forest Service relies on to prove ownership of the 859 head that they claim we never purchased. In other words, we've got to win at least one of these arguments. They can't use the brand inspection certificate as dispositive weight that the owner was Garnett Lewis on the 859 and then look at this brand inspection certificate. I thought the 859 were sold to third party. Are you now saying, no, they were really sold to third party? I'm just saying that that identifies the owner as Garnett Lewis. This one identifies. Bruce and Mary Agar, and that's the problem, isn't it? I mean, the Forest Service is saying your claim in ownership of an additional 859 head of cattle, but the brand inspection reports don't confirm that. Instead, they suggest just the opposite, that somebody else beside the Agars owns those cattle. Don't you also have the problem that your argument that you're going to call those 20%, doesn't that violate the regulations of the Forest Service in any event? You can't do that? That gets to another critical factual point that I want to make, which is that this was not a surprise to the Forest Service. We structured this transaction with the Forest Service's involvement. In terms of this- With regard to, I mean, the Forest Service didn't know about all these supposed partners, the Sidaways, the Smiths, that they didn't know until after the representations were made. They had the transaction documents before they were executed. To the degree they were legible. I admit that a lot of them aren't very legible. The- You wanted to make a point. Your time is running out. We've got one minute and 34 seconds. You started to say an issue that was never addressed, and then we jumped on you. I'm talking about the willfulness analysis, which is that there, you know, let's just assume for sake of argument that they can prove 17 months after the fact that something should have said, we should have identified the base property, which we did purchase, other than the cattle as the basis of the waiver. Why did that justify total cancellation? You know, there's regulations that say, approach cancellation with discretion. Seldom do it for a first offense. The only thing they can hang, the only thing the agency hung its hat on, in even addressing this issue, is the statement that says, knowingly and willfully making a false statement or a misrepresentation on the permit or the waiver application. And that's a complete step of the analysis that was never attempted here. Now, the willfulness issue gets addressed by the district court and on appeal. But again, we can't reconstruct, there's not a right result, wrong theory outcome here. I would like to reserve at least a little bit of rebuttal time. You have 25 seconds. I'm at 30 seconds, so I'm going to sit down if I can. Move. I might give you a minute. Thank you. If you smile nicely. Why did the Forest Service have to cancel this permit? Well, I think there's two independent basis for the cancellation decision. One is that the Forest Service had determined that the permitted cattle that were the underlying basis for the permit had been transferred away, were no longer owned by the company, and therefore it was impossible to come into compliance with the terms of the permit. And under Forest Service regulations, where a permanent change would be required in the permit, or there'd be no way to reestablish compliance, a cancellation is warranted. And that's based not on a finding of willfulness, but simply on the fact that neither the terms of the permit nor the terms of Forest Service regulations are being applied with. Did you communicate that decision in that way to the plaintiff? Yes. I believe that the first level decision specifically makes the finding that there was a lack of compliance with the terms of the grazing permit as to both the Chesina Nunez allotment and the Log Creek allotment, which are the two portions of the- So willfulness wasn't the basis for the decision? Well, with respect to the off-grazing cattle, there was two separate decisions made regarding to the Chesina Nunez allotment. One is that they couldn't prove compliance with the terms of the permit. The other was the unauthorized grazing concern. And that is where the Forest Service specifically in the decision document cited to the willfulness requirement. It also found that it was impossible that it would not be knowing that there was unauthorized cattle because there was, in fact, an agreement, apparently, between Fence Creek Cattle Company and one of the other members of the Gazelle JV, which was this larger business venture, to allow grazing of the Gazelle cattle. So there was a specific agreement allowing unauthorized grazing, and the Service found that was reasonable evidence of at least intentionality and Let me ask you this. I'm just – some of this is – this question might also tip over into the next case we're going to hear. But what constitutional due process rights attach here, if any? There's relatively limited constitutional due process because- Well, once the Forest Service issues a grazing permit, isn't there some sort of property interest in the maintenance of that property? There's not a property interest. The courts have held consistently since the 1930s that the scheme was unauthorized. In the next case that's coming up, the Forest Service takes the position that there is – that there is some due process – there is a protectable property interest in the maintenance – in the right to maintain a permit. So what – I'm just trying to resolve my own mind what the Forest position is. Well, I think the Service has consistently recognized that these permits are valuable once established. And in a sense, since they're so important financially to the individual permit holder, the Forest Service has recognized a system of rights. I think it's very clear, at least, that the courts have said that there's no property interest. And in fact, all of the grazing permits and the regulations specifically say, by accepting this permit, you are not accepting a property interest. So they have no – so once they get the permit, the Service can just terminate it? Well, no. I mean, the Service has a lot of delineated process inside of the Service. In addition, in cases not involving willfulness, there are the requirements of the APA that they be given notice and the opportunity to cure a defect. But there's no constitutional requirement? You know, since the constitutional requirement is not at issue at this appeal, I don't want to – this may be best and better addressed to the – I'm just curious. Because, well, but, you know, that all turns on whether or not there's a protectable property interest. Right. And I – my understanding is that the courts have been consistently clear that there's not a protectable property interest for due process purposes. But again, I'm not trying to push the question off of myself, but I want to make sure that the person who has the – who spent the most time looking at this is the one who gives you the answer. Okay. But you do agree that there is a statutory and regulatory scheme that the Forest Service operates under before it cancels a permit that is applicable to this case? Well, I wouldn't agree that the APA's statutory requirements are applicable to this case. But there are two things that are. Well, by – I guess I'm looking first at the APA, but then I'm looking at the implementing regulations that the Forest Service has adopted pursuant to whatever its originating statute is that governs the issuance and cancellation of grazing permits. Yes. There's a fairly substantial body of documents that the service has promulgated governing both the issuance of grazing permits, the cancellation decisions, then independently of that, the appeal process for appealing changes in use on Forest Service land. So would you agree then that we look to that regulatory framework in order to determine whether the process that was applied here was fair within the context of the regulation? That's correct. I think if you look at all of the Forest Service regulations, you would see that they were fairly scrupulously adhered to now. We'll call that statutory due process in lieu of constitutional. And even within statutory due process, there's the due process that the Forest Service sets up pursuant to its own regulations, and then what due process would be required under the APA. And the relevant issue they're raising is that under APA 558 specifically, at least in cases where there has been no finding of willfulness, there is a requirement that there be notice and an opportunity to cure. What's your response to Mr. Turk's argument that the Forest Service was wrong from the get-go here not to first send a letter to the AGARs as opposed to these informal telephone and meeting meetings? Well, I think that that reasoning is infinitely aggressive because it creates a circularity where the very fact that the agency offered an opportunity to cure itself violates antistiguity. That is, if the first thing they ever did was to send a letter, then what appellants would say is this is exactly antistiguity because what happened there is a letter was sent first that says, we think you're out of compliance with the terms of your permit. Explain to us why you're not. And there, the court said, well, if that's the first contact, it's not giving an opportunity to provide cure. So it creates this circularity where whenever the service would offer an opportunity to cure, they'd say there's no notice, and whenever they offer notice first, they'd say there was no opportunity to cure. Well, isn't the problem in Anguished Stewie, and maybe I should let you make the argument, but as I understand your argument, it is that it was a fait accompli in Anguished Stewie, that the letter essentially said, we're canceling your permit unless you can show cause why we shouldn't. That's correct. That was the first contact. There were questions raised by the Forest Service about who owned these cattle, and the aggers were given an opportunity to try and explain the answer to that question. That's correct. And then when they couldn't, then the Forest Service started the formal regulatory proceedings. Right, and I think that, in fact, the process that the Forest Service used in this case is, to some extent, a response to antistiguity. It started first with an informal investigation, which was essentially the ranger heard there was possible evidence of noncompliance, and called over to the main partner in the company and said, can you explain to me what is going on? And then when he wasn't entirely clear from the phone call, he sent a letter asking for additional follow-up. And in fact, that letter lists specific documents that they could send back in order to demonstrate compliance, which is extremely consistent with the APA requirement. There was then a second letter, and it wasn't until a letter in early September, where they first said, hey, consider this notice. You could potentially have your grazing permits canceled. You haven't provided these documents, and again, here's a list of the documents you could provide. But the documents were the only way in which they, the Fence Creek could satisfy the concerns of the Forest Service? I don't think the documents were listed as restrictive. The documents were given as examples of the type of thing that would be able to demonstrate that Fence Creek had acquired the permitted cattle necessary to support the grazing permit. I get the impression from reading everything that I read that the Forest Service they don't cancel permits rather quickly. It seems like it's an exceptional thing for them to cancel a permit. Well, I think what's somewhat unique in this case that does make it different from Enchestegee is that in Enchestegee there was a more meaningful possibility that going forward the permittee would be able to comply on a regular basis. In this case what happened is the Fence Creek immediately either didn't purchase or immediately turned around and resold the cattle that was the basis for the permit. So in a sense there wasn't a way to come into compliance. It would be kind of like, you know, if you got into a car crash and you were fine but your car was totaled and you get a renewal form from the Department of Motor Vehicles. If you fill out that renewal form and then they say, wait a minute, we just found out your car's been totaled from the insurance company, the only thing they could ask you to do at that point is provide evidence, no, my car actually still exists, I got it fixed. There's no way you could justify the continued existence of a registration on a vehicle that no longer exists. Did they reapply for the permit? Yes. And, I mean, Fence Creek still could go through the process of reapplying for a permit on this land. In fact, at least part of the Chesna Miss is right now under a temporary grazing permit. So. Is the bar three years? If you're canceled, are you ineligible to reapply for three years? I thought I read that somewhere. To be honest, I'm not certain what the time period is. So where do these count? Where do these, where do they count? I mean, what happens to them when they can't participate? Well, when they establish, when they accept the permit, even if the permit is not based on the transfer of base property, they still need to produce, they still need to obtain a base property. So I suppose the cattle, at least temporarily, would move to the base property until they found other suitable grazing land or arranged for a transfer of the cattle. This case is slightly different in that they had sort of a rotating grazing land. And in some grazing cases, they're on the base property half of the time and on the land half of the time. In this case, they were moving among the different allotments over the course of the season. Does the Forest Service maintain sort of administrative precedential decisions about their cancellation decisions? I don't think that there's a, there's not sort of a standard record of recorded decisions, which is an issue tangentially in this case, because they had requested that the district court allow an additional 25 grazing cases into the record. I do think that the manual, the Forest Service manuals are quite, quite specific in how they instruct the district renters to approach the cancellation decisions. So for example, there are a number of cases where it encourages them to look at the possibility of suspending a permit for non-compliance, as opposed to going straight to cancellation. By contrast, where a, where there would be a requirement of a permanent change to the permit, they're supposed to cancel in that situation. If there are no further questions. Thank you. First of all, it's everyone's struggle with this, and Schustigy is, he lives, he lives in southern Idaho. Let's just call it the A case. How's that? I remember the case well. Judge Pai has alluded to this. Let me describe the nature of the proceedings here. We got a letter in June. We got a letter in September. We got a decision in December. Your permit's canceled. There's not like any proceedings. There's not testimony under oath. It's canceled. You keep overlooking all the phone calls, all right? Ranger Smith picks up the phone and he says, Mr. Agar, whose cattle are those on the allotment? Okay, I, back to the, and I'm just going to give you the sites again because I don't, I didn't get the sense that my argument hit fertile ground enough. You're running into problems with it. Your argument's running into problems with the evidence. That's, that's what's causing the problem. The evidence. The brand inspection certificate identifies the owner. On the 608-59, the name of the owner there is deemed dispositive by the agency. On the unauthorized livestock on the allotment, it says, Fence Creek Cattle Company is the owner. In other words, that supports the version of the story that we told them beginning in August of last year that they're Fence Creek Cattle Company. Fence Creek bought these other cattle. You know, I, I just urge you to look at those sites. The only proof you have of that is the escrow instructions that said we're buying, you know, 1,549 head of cattle. But then the brand inspection reports show that 859 head went somewhere else. I want to, again, back to my point, and it's critical for me to make this point. The Forest Service knew about all this. And I'm, if there's, if this case is complex, I want to try to distill it to its simplest element. This is a sticky note. The Forest Service had this in its file. It's a handwritten note from Rick Smith. We didn't give it to him in 05. It's dated December 03, December 1st, actually. It's, says Kirk Macon will send brand inspection slips for Lucky Diamond Cattle being sold. And it's signed Rick Smith. They knew what was going on. There's, there's one other critical point that I want to make here, because this 1,459 number has no legal significance. If there's a, if there's a significant government interest in administration of grazing, maybe, I, I hope we'd all agree that it's protection of the resource. But doesn't the, counsel, doesn't the record show that there's no question they acquired 600 head of cattle. They had a permit to graze almost 1,500 head, and they tried to make up the difference with cattle from the Sidaways, the Smiths, and others. Not cattle that came from the Lewis Estate. They didn't. Am I wrong on that? They, they didn't have a permit to graze 15. That, that's what I'm trying to say is the 1,459 was not the permitted numbers. Isn't that what the Lewis Estate permit was? That the Lewis Estate waived? No. No, it was at most 1,229, and that's, that's in the permit documents. In other words, we, the reason it says 1,459 on there is because the last way you want to mess up a transaction to buy a 27,000 acre ranch is by telling someone that 200 of their head aren't good enough to run in your herd. But anyway. Your time is running out. Your final point. I just want to finish this last point, which is that the Forest Service, in reality, the Forest Service wanted to run 600 on the Chesna Miss. In other words, you know, we're being pilloried a couple of years after the fact for, for helping them implement their plan. And specifically, let me give you a site here. Excerpts of record 226. In fact, there was, there's talk in that document about whether the agent, the agency wanted to issue the permit for 600. Because as you can imagine, that's when a lot of people try to unload their permit is when they see the writing on the wall, and the herd numbers are going to be cut. So, one final point, if I can beg your indulgence. The decision doesn't say failure to comply with permit terms. And I urge you to look at it's administrative record 775 to 776. That's not what the agency said when they selected cancellation among the array of options. I appreciate your indulgence. Thank you. Thank you, counsel. We appreciate your argument on both sides. And Fence Creek Cattle Company versus United States is submitted.
judges: Paez, Tallman, Smith M.